**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**QUEEN CITY COACH COMPANY, Respondent.**

No. 11722.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 6, 1968.

Decided July 8, 1968.

Robert A. Giannasi, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., N. L. R. B., on the brief), for petitioner.

Brown Hill Boswell, Charlotte, N. C., (Whiteford S. Blakeney, John F. Ray, and Blakeney, Alexander & Machen, Charlotte, N. C., on the brief), for respondent.

Before BOREMAN, WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

■ The Board petitions for enforcement of its order predicated upon its findings that Queen City Coach Co. (the "company") violated §§ 8(a) (1) and (3) of the Labor-Management Relations Act, 29 U.S.C. § 158(a) (1) and (3). The case principally involves the discharge of three employees: (a) the discharge of Parker Love and Lane Garrison, both of whom had been employed as bus drivers for approximately 23 years, and both of whom were allegedly discharged for giving free bus rides to Miss Joyce Lewis, who had been specially employed to "check" their activities as well as the activities of other drivers, and (b) the discharge of Thomas Horne, who was allegedly discharged for unsatisfactory service.[1] As to each the ultimate question was whether his discharge was motivated by antiunion reasons, because § 8(a) (3) prohibits discrimination to discourage participation in union activities, as well as to discourage adhesion to union membership. Radio Officers' Union, etc. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). The question is largely factual, and where, as here, evidence of the company's discriminatory motives conflicts with the company's explanation of why it discharged the three, our role is one of determining whether the record as a whole provides substantial support for the Board's resolution of the conflicts. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). A subsidiary question, but one implicit in the main question concerning the discharge of Love and Garrison, is whether the checking by Miss Lewis was illegal surveillance in violation of § 8(a) (1).

We conclude that the company violated § 8(a) (3) and (1) in hiring Miss Lewis for the purpose for which she was employed and in discharging employees Garrison and Love. We conclude, also, that the discharge of Horne was not in violation of § 8(a) (3).

---

1. The Board also found that the company violated § 8(a) (1) by its surveillance of employees who were preparing for the Board hearing in the instant case. The surveillance occurred while the employees were being interviewed by a Board attorney at a motel in Fayetteville, North Carolina. The company does not challenge the sufficiency of the evidence to support this finding, and we do not disturb it. Enforcement of the portion of the order based thereon will be granted.

## GARRISON and LOVE

Miss Lewis was a housekeeper at a motel in Florence, South Carolina, where Frank Snodgrass, an investigator employed by the company to check bus drivers, was a guest. He asked Miss Lewis if she knew anyone who might be interested in a job "checking bus drivers" and she mentioned her brother, Samuel Lewis, and a certain Alfred Smith, whom Snodgrass employed. When she made known to Snodgrass that she knew Lane Garrison, Parker Love and another bus driver-employee, Snodgrass employed her to investigate their activities.

There was testimony from Miss Lewis and her brother that Snodgrass spoke to Miss Lewis of the need to investigate the activities of Garrison and Love because they were "union." He told her that Garrison and Love and another employee "belonged to the union" and that, while he was not sure about Love, he would like to "get something on Love" as well. He instructed her to inquire of Love if he was with the union and said that the company was checking on the activities of bus drivers because it "wanted to get rid of" those in the union. She was also instructed to report the names of any drivers whom she heard discussing the union.

Miss Lewis, under instructions from Snodgrass, rode with Garrison and Love from Florence to Myrtle Beach, on their regular routes, without paying a fare.[2] On each occasion, she reported the fact to Snodgrass who, in turn, reported to the supervisor of the drivers at the company's main office, in Charlotte, North Carolina. Miss Lewis was also instructed to try to ride with three other bus drivers without paying a fare. She was not successful in getting free rides, but reported one of the other drivers for speeding. She was told that one of the other bus drivers was the vice-president of the union and that a second was "one of the big men in the union," and that a third was the "one we wanted" and the one for whom Snodgrass would get $2,-000 bonus if he caught him, $100 of which he promised to Miss Lewis if they succeeded. Miss Lewis was successful in getting a free ride with a fourth bus driver. She reported this incident, but the driver was neither discharged nor reprimanded. No disciplinary actions were taken, either, with regard to some other offenses that Miss Lewis reported.

About six weeks after Miss Lewis rode with Garrison and Love without paying a fare they were called to Charlotte, North Carolina, and discharged because their "services were unsatisfactory." Each had been an employee for about 23 years. Neither had been previously warned of any misconduct on his part or told exactly why his services were unsatisfactory.

It is undisputed that Miss Lewis was successful in getting Garrison and Love to transport her on a company bus from Florence to Myrtle Beach free of charge, and that this was a violation of law and company regulation. The record also shows that surveillance in the industry is not uncommon to assure efficient service and compliance by bus drivers with the law and company regulations. Indeed, there was evidence that the company had contracted with an independent agency to provide checkers at the time Miss Lewis' services were enlisted.

■ There was, nevertheless, a sufficient evidentiary basis from which the Board could find that the employment of Miss Lewis was for illegal surveillance and that the company was motivated to discharge Garrison and Love because of anti-union animus. Aside from her direct and partially corroborated testimony about the purpose of her employment, the Board could properly attach significance to the unusual features of her employment, i.e., that she was without experience as a checker, that professional

---

2. There was evidence that she accomplished her purpose by representing that she was sick, without funds and needed to get to Myrtle Beach to obtain medical treatment.

checkers had already been employed, and that she was known to be a personal friend of the two drivers whose discharge is in question. Of probative value supporting the Board's conclusion also was the fact that both drivers were long-time employees, that resort to less severe disciplinary action was not had and that another driver who gave her free rides was not discharged.

To avoid the inferences which flowed from the testimony of Miss Lewis, the company cites minor inconsistencies in what she said in order to impeach her credibility. Her credibility is also attacked by the argument that her account of the facts can be explained by her desire to redeem herself with her friends whom she had been instrumental in having discharged. The company's present attack upon Miss Lewis' credibility occasions surprise since, previously, it relied upon her word to discharge summarily two employees of long standing. Even now, it implicitly asks us to believe that portion of Miss Lewis' testimony in which she stated that she received free rides, while disbelieving her testimony about what she was told by Snodgrass. Neither the trial examiner nor the Board was required to make such a one-sided credibility determination. If Miss Lewis was to be believed, she was, on this record, to be believed in her entirety. We perceive no valid reason to overturn the determination of credibility which has been made.

We conclude, therefore, that her employment to find grounds of discharge of union supporters violated § 8(a) (1) of the Act, and that Garrison and Love were discharged in violation of § 8(a) (3) of the Act.

### THOMAS HORNE

■ Thomas Horne was not a satisfactory employee. The uncontradicted evidence shows that during the fourteen months that Horne was in Augusta with the company, at least twelve written complaints were received about him by the home office. The most serious of his derelictions of duty included: refusing to clean the restroom facilities on his bus; refusing to pick up freight and leaving passengers; an unavoidable accident; being an hour late—and finally appearing in a disheveled condition—in meeting a charter bus which he was to drive, although he had been given specific instructions to take special care of these passengers because they were old customers and wanted a speedy trip; driving recklessly and running other cars off the road; and telling passengers on a charter trip that he had taken their bus to a garage, thereby depriving them of its use, when in fact it was Sunday and the garage was closed. Despite these many and varied instances of misconduct, the Board concluded that Horne was discriminatorily discharged.

Horne became a union member about a month before his discharge. However, the only evidence showing that the company knew that Horne had joined the union was Horne's own testimony that Wilkinson, the division manager, had told him that his name had been sent into the home office as a union supporter.[3] Wilkinson flatly denied having said this to Horne, and the company's chief supervisor of drivers in the home office denied having received information about Horne's union membership.

Thus, to reach the result which it did the Board necessarily found that Horne was a credible witness. On the record before us, this determination cannot stand. One of the complaints received about Horne related directly to his lack of veracity; he had lied to charter customers about the availability of their

3. There was also evidence that the company knew more than seven months before that Horne fraternized with a known union advocate. However, the Board has not relied upon this, presumably because if mere fraternization with a union advocate was sufficient to make the company want to discharge Horne, there was ample opportunity for it to do so in the intervening period due to misconduct of Horne.

bus in order to avoid performing his job Moreover, Horne stated that a fellow-driver, Ralph Little, was present when Wilkinson allegedly told him that his name had been sent in to the home office as a union supporter. Little denied any knowledge of the incident.

Under these circumstances, the substantial evidence supports the company's contrary explanation of the discharge —that the evidence of Horne's reckless driving caused the company to review Horne's record, and that his past misconduct, combined with the complaint about Horne's lying to the charter customers which was received by the company just four days before the discharge, caused the company to fire him. The substantial evidence fails to establish that the company had reason to know that Horne had any close union connection. On the record as a whole, the Board's determination that § 8(a)(3) was violated, thus, cannot stand.

Enforcement granted in part and denied in part.