NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED ASSOCIATION OF JOURNEY-
MEN AND APPRENTICES OF the
PLUMBING AND PIPEFITTING IN-
DUSTRY OF the UNITED STATES
AND CANADA, LOCAL 633, AFL–CIO,
Respondent.

No. 19711.

United States Court of Appeals,
Sixth Circuit.

April 8, 1970.

Ira M. Goldberg, N. L. R. B., Washing-
ton, D. C. (Arnold Ordman, Gen. Coun-
sel, Dominick L. Manoli, Associate Gen.
Counsel, Marcel Mallet-Prevost, Asst.
Gen. Counsel, Abigail Cooley Baskir,
Atty., N. L. R. B., Washington, D. C.,
on the brief), for petitioner.

Charles R. Isenberg, Louisville, Ky.,
(Irwin H. Cutler, Jr., Segal, Isenberg,
Sales & Stewart, Louisville, Ky., on the
brief), for respondent.

Before PHILLIPS, Chief Judge, WEICK and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

In this case the National Labor Relations Board petitions for enforcement of its order against Local 633 of the plumbers union. The board found that Local 633 violated section 8(b) (1) (A) and (2) of the National Labor Relations Act, 29 U.S.C. § 158(b) (1) (A), (b) (2) (1964), by causing certain nonmembers of the union either to be laid off or to be denied employment by certain employers within the union's jurisdiction, and by maintaining a discriminatory hiring hall, giving preference to members of Local 633.

The findings of the Board (affirming those of the Trial Examiner) are as follows:

"* * * Respondent [union] * * * sought and obtained the lay-off of Joseph Tabor and revoked the work permit of Albert Harned because these men were not members of Respondent. This conduct was engaged in to obtain work for Respondent's members, Manion and Todd, at the Chicago job site. Heath's own testimony makes clear that Respondent caused Tabor's layoff and revoked Harned's work permit because they were not members of Respondent. The credited testimony of James Todd and Eldridge Milam supports the General Counsel's contention that Keller, Hargan, Kaysinger, Petree were laid off because of Heath's demand and because they, like Tabor and Harned, had to make room for members of Respondent. Keller's layoff at Ford also falls into the familiar pattern of conduct followed by Respondent with the slight modification that Keller's job was sought for Nixon Scott, a member of the International Union working on a travel card in Respondent's jurisdiction, who thus had preference for jobs over Keller who was not a member of Respondent or any of Respondent's sister locals. I cannot attach any significance to Respondent's contention that the positions obtained for the laid off employees by the Respondent were temporary and as journeymen, with more experience and seniority, became available, the laid off employees would be 'rolled.' The evidence is clear that Respondent maintained a practice of giving union members preference over nonunion employees. Respondent's reliance on Keller's testimony that 'when older men or older members come to take your job you have to give your place up and let them have it because they got seniority on you' is misplaced. It is clear from Heath's own testimony that seniority had nothing to do with job acquisition and retention but rather that union membership was the test."

The Board seeks enforcement of an order requiring Local 633 to cease and desist from the discriminatory practices found above and to make the discriminatees whole by backpay.

At the hearing before the Trial Examiner, the union took the position that it had not occasioned any of the discharges or refusals of jobs with which the Board's order dealt. While the facts were clearly in dispute before the Trial Examiner, he found (and the Board affirmed his findings) that Local 633 did occasion the discriminatory practices referred to. On this whole record, we find substantial evidence to support the findings of the Trial Examiner and the Board.

Before this court the union also takes the position that even if it had occasioned the discharges or refusal of jobs, it had a right to do so under section 8(f) of the Act, the construction trades' proviso, which states:

"(f) It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employ-

ment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization, after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided,* That nothing in this subsection shall set aside the final proviso to subsection (a) (3) of this section: *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title." 29 U.S.C. § 158(f) (1964).

 Section 8(f), however, does not give a construction trades union carte blanche in relation to hiring and discharge practices. On the contrary, the proviso is precisely worded, and it would take specific affirmative testimony by Local 633 concerning the existence of a lawful union shop agreement and the union's maintenance of qualification examination practices and a nondiscrim-

inatory seniority list to give validity to the section 8(f) defense. We find, however, that there is no such evidence in this record.

The hiring provision in the labor-management agreement provided for a nondiscriminatory hiring system:

"The employer or the individual contracting firm agrees to notify the Union when additional or replacement employees are needed. The Union agrees to furnish applicants upon nondiscriminatory bases to perform the necessary work when so notified within 48 hours after receiving the request from the employer. The decision with regard to hire and tenure of all employees shall be made by the Employer. In consideration of the foregoing Agreement by the Employer, the Unions agree to furnish competent and qualified applicants for reference when requested, as provided in the above paragraph, upon a nondiscriminatory basis."

The undisputed testimony of the union's business agent, however, was:

"MR. LANKER: Now, when you were in office as Business Agent of 633 Plumbers Union, you kept a running employment list, did you not?

"THE WITNESS: I kept an employment—an unemployment list of only my members of Local 633.

"Q And this unemployment list, I assume, was for the purpose of referral of applicants to jobs, wasn't that the whole idea of this list?

"A Yes."

The Trial Examiner and the Board found:

"The record clearly shows that the controlling factor of the layoffs and the revocation of the referral at all three employment sites was lack of membership in Respondent of the men involved."

There clearly was substantial evidence on this whole record to support this conclusion.

This court has previously said:

"Discharge of an employee for non-membership in a union entitled to require such membership under a valid union security control is permissible but 'no other discrimination aimed at encouraging employees to join, retain membership, or stay in good standing in a union is condoned.' Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 41, 42, 74 S.Ct. 323, 336, 98 L.Ed. 455 * * *." NLRB v. Animated Displays Co., 327 F.2d 230, 232 (6th Cir. 1964).

*See also* NLRB v. Houston Maritime Association, 337 F.2d 333 (5th Cir. 1964).

Whatever the merits of a system of hiring limited to membership in a particular construction trades local might be, such a system is clearly not in keeping with the provisions of present federal law. 29 U.S.C. § 158(a) (3), (f) (1964).

Enforcement of the Board's order is granted.