The CATHOLIC MEDICAL CENTER OF BROOKLYN AND QUEENS, INC., Mary Immaculate Hospital Division and St. Mary's Hospital Division, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 917, 1107, Dockets 79–4201, 80–4008.

United States Court of Appeals, Second Circuit.

Argued March 27, 1980.

Decided April 24, 1980.

---

John F. Gibbons, New York City (Kelley, Drye & Warren, New York City, Paul L. Bressan, and Patricia Hytten Sachs, New York City, of counsel), for petitioner.

Michael R. White, N.L.R.B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and William F. Wachter, Atty., Washington, D. C., of counsel), for respondent.

Before FRIENDLY and MESKILL, Circuit Judges, and THOMSEN, District Judge.*

PER CURIAM:

The Catholic Medical Center of Brooklyn and Queens, Inc. (the Center) petitions us to review and set aside, and the National Labor Relations Board (NLRB or the Board) cross-petitions us to enforce, the Board's order, 245 NLRB No. 106 (1979), entered after this court had vacated a previous order, 236 NLRB 497 (1978), and remanded to the Board for further proceedings consist-

ent with our opinion, 589 F.2d 1166 (1978). The initial order found that the Center had violated §§ 8(a)(5) and (1) of the Act by refusing to recognize, bargain with, or provide certain information concerning employees to the New York State Federation of Physicians and Dentists (the Union) which the Board had certified after elections conducted at the Center's Mary Immaculate and St. Mary's Hospital Divisions, and that the Center had violated §§ 8(a)(3) and (1) by suspending for three weeks, in the two certified units, the salary increase reviews that were routinely accorded other salaried physicians and dentists. We held in our earlier opinion, with which familiarity is assumed, that the Board erred in reaching its § 8(a)(5) determination by limiting its consideration of the Center's objections to the election, which were based on supervisory activity on behalf of the Union, to those activities occurring after the filing of the later of two election petitions, 589 F.2d at 1169–74; at the very least, we directed, the Board must consider supervisory conduct occurring subsequent to the filing of the first petition. With respect to the § 8(a)(3) charge, we concluded that the Center, although acting in good faith, had indeed committed an unfair labor practice, albeit "one of the most inconsequential unfair labor practice in the history of the National Labor Relations Act", 589 F.2d at 1174–75; and we directed the Board to reconsider its decision to proceed with this charge in the light of the reevaluation of the § 8(a)(5) charge which was necessary in any event. 589 F.2d at 1174–75. We also set aside the "broad order" which the Board had inexplicably entered, and directed that "the cease and desist provisions of such order, if any, as may hereafter be entered shall be limited to the unfair labor practices found and other like or related unlawful acts." 589 F.2d at 1175.

Predictably the Board concluded that, after extending its scrutiny of supervisory support for the Union to include activities going back to the first petition [1] and view-

---

* United States District Court for the District of Maryland, sitting by designation.

1. Although our opinion permitted the Center to attack more generally the rule of *Ideal Electric*

ing still earlier acts and statements as lending "meaning and dimension" to post-petition activities, see 245 NLRB No. 106 fn. 16, "the evidence of supervisory conduct in support of the Federation did not impair the employees' freedom of choice in the election or constitute interference which would warrant setting aside the election," *id.* at p. 80. It also adhered to its earlier finding of a § 8(a)(3) violation.[2] However, it narrowed the scope of its previous order as we had directed.

In its discussion of the § 8(a)(5) charge the Board noted, p. 78, that "mere supervisory participation in a union's organizational campaign does not necessarily warrant setting aside an election" but that such participation could require that result where "(1) employees may be led to believe the supervisor was acting on behalf of the employer and that the employer favors the union; and (2) employees could reasonably have been coerced out of fear of future retaliation by union-oriented supervisors into supporting the union."[3] In view of the Center's vigorous campaign against the Union, we agree with the Board's conclusion that the case does not fall within category (1); the issue concerns category (2). If we were the decisionmakers, we might be inclined to rule that the election was tainted in light of the possible impact of supervisory efforts on the Union's behalf. See *NLRB v. Handy Hardware Wholesale, Inc.,* 542 F.2d 935, 938 (5 Cir. 1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 271 (1977); *Turner's Express, Inc. v. NLRB,* 456 F.2d 289, 292–93 (4 Cir. 1972). However,

we need not decide this. Determination of the effect of the supervisors' conduct is essentially a matter of drawing inferences, and it has long been settled that an agency's conclusions based upon such inferences should not be set aside by a reviewing court unless they transgress the bounds of reason. See, e. g., *FTC v. Pacific States Paper Ass'n,* 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534 (1927); *Radio Officers Union v. NLRB,* 347 U.S. 17, 48–52, 74 S.Ct. 323, 339–341, 98 L.Ed. 455 (1954); *consolo v. FMC,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1967). We cannot say that the Board transgressed these bounds by inferring that the supervisors' pro-Union activities left employee freedom of choice in an election unimpaired; the case might well stand differently if the Union had sought recognition on the basis of holding a majority of authorization cards.

With respect to the § 8(a)(3) charge, we previously found a violation in the Center's three-week suspension of salary review effected without consulting the Union, 589 F.2d at 1174. While we adhere to our view that the violation was inconsequential under all the circumstances, this case is distinguishable from those in which the Board has applied a *de minimis* doctrine, see 589 F.2d at 1175 n.11, and the choice whether or not to proceed with such trivia is for the General Counsel and the Board, rather than for us.

Petition for review denied; cross-petition to enforce granted.

---

& *Manufacturing Co.,* 134 NLRB 1275, 1277–78 (1961), limiting the Board's scrutiny of objections to an election to conduct between the filing of a petition and the election, see 589 F.2d at 1172 n.6, the Center apparently did not press this argument. See its Brief in this court p. 30 fn.*, but see the Board's opinion, p. 76. Its argument was rather that if the period after the filing of the first petition is scrutinized and still earlier activities are consulted for "meaning and dimension", the Board must necessarily conclude that the election was tainted. In any event the Center does not challenge the *Ideal Electric* rule in its Brief to this court.

**2.** In footnote 23 to the Board's opinion, Member Penello, citing earlier expressions of his to

similar effect, noted that if the § 8(a)(3) violation stood alone, he "would not consign the Board's scarce resources to those cases where the 'alleged misconduct is such that no purpose would be served by the issuance of a remedial order' " [quoting from *Peoria Journal Star,* 242 NLRB No. 139 (1979)]. Here, however, he concurred in the § 8(a)(3) determination on the ground that the § 8(a)(5) violation deprived the salary review suspension of that "insignificant or isolated" character that might otherwise render its prosecution pointless.

**3.** We assume that by "and", the Board meant "or".