Josephine CRONIN, Irma Aaron, Ida Reid, Evelyn Baxter, Marge Stafford, Katie Cofey, and Anthony M. Mielcarek, Plaintiffs,

v.

OSCAR MAYER CORPORATION, a DIVISION OF GENERAL FOODS CORPORATION, and the United Food and Commercial Workers Union, Local 125, AFL–CIO, Defendants.

Civ. A. No. 82–3615.

United States District Court,
E.D. Pennsylvania.

Jan. 8, 1986.

S. Allen Needleman, Needleman, Needleman, Caney, Stein & Kratzer, Ltd., Philadelphia, Pa., for plaintiffs.

Mark P. Muller, and Gail Lopez-Henriquez, Freedman & Lorry, Philadelphia, Pa., for Local 125.

Francis M. Milone, and Stephanie A. Middleton, Morgan, Lewis & Bockius, Philadelphia, Pa., and John A. Ricca, Sarah de Laurentis, and William Ostan, General Foods Corp., White Plains, N.Y., for Oscar Mayer.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SHAPIRO, District Judge.

This is an action brought by certain employees against their employer and their union for breach of the collective bargaining agreement by the employer and the "duty of fair representation" by the union. The case was tried without a jury; the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52 follow.

### Findings of Fact

Defendant Oscar Mayer Foods Corporation[1] ("Oscar Mayer") is a wholly owned subsidiary of General Foods Corporation. Oscar Mayer owns and operates a plant at 3333 South Front Street, Philadelphia, Pennsylvania (the "plant").

Plaintiffs, employed in various capacities at the Oscar Mayer plant on February 26, 1982, allege that on and after February 26, 1982 Oscar Mayer violated the Collective

---

1. Oscar Mayer Foods Corporation is incorrectly identified as Oscar Mayer Corporation in the caption of this case.

Bargaining Agreement (the "Agreement"; Ex. P–1) in effect at the plant.[2] Defendant United Foods and Commercial Workers Union, Local 125, AFL–CIO ("Local 125" or the "Union") is the collective bargaining representative of certain employees at the plant. Plaintiffs brought this action against Local 125 for breach of its "duty of fair representation." [3]

Employees at the Oscar Mayer plant work in various departments. Production jobs at the plant were divided by the labor contract into three categories:

Group A—jobs which are primarily of interest to males.

Group B—jobs which are primarily of interest to females.

Group C—jobs which are of interest to both males and females.

Agreement, Article 10, Section 2.[4] Section 3 of Article 10 of the Agreement provides that "in applying seniority" employees will not be required to take nor be considered for jobs primarily of interest to members of the opposite sex *unless they so request.*

This job classification system was approved by the Equal Employment Opportunity Commission ("EEOC") in a Conciliation Agreement entered into in 1975 and reviewed for compliance in 1977 (Ex. DM–37). ("DM" refers to an exhibit introduced by defendant Oscar Mayer.)

The 1975 conciliation agreement provides in part:

Respondent agrees that it will counsel all female production employes currently employed at the Philadelphia plant on Company time and at their normal rates of pay, with the object of acquainting such employees with the various opportunities available in Group A jobs and to fully explain to them the nature, level of difficulty, rates of pay, and advancement

opportunities available to them in such jobs.

Conciliation Agreement, Article III, Section 3(c)(1).

Each of the female plaintiffs in this action attended presentations at which all Group A jobs at the plant were discussed. The script used by Oscar Mayer personnel at these presentations (Ex. DM–38) concludes:

It has been our intent to identify and describe various jobs in the plant that have been traditionally done by men. We hope this presentation has been informative and that when any of these jobs are posted you will feel free to sign for them. *This does not mean that the ABC system will be eliminated but that you are permitted and encouraged to bid on group "A" jobs if you so desire.* Clarification of the job posting procedures can be found in the Labor Agreement on page 20 through 30. At this point, if you have any questions, the foreman or Personnel representative present will gladly try to answer them. Thank you for your attention. (Emphasis added).

Pages twenty through thirty of the Agreement cover sections 4 through 20 of Article 9.

In the event of a department closing, Article 9, Section 24 provides for "displacement" into other jobs in the plant on the basis of seniority. Subsection (a) provides in part: "[w]henever a department is closed permanently, the employees with posted jobs in the discontinued department shall have, in accordance with the following procedures, the opportunity to displace junior employees and establish seniority in a new department." "Posted" jobs are perma-

---

**2.** The Agreement was in effect from November 5, 1979 to November 7, 1982. All production employees were given copies of the Agreement.

**3.** On January 19, 1983, the court granted summary judgment in favor of both defendants against plaintiff Marge Stafford on all her claims. On July 1, 1983, the court granted summary judgment in favor of both defendants against plaintiffs Josephine Cronin, Irma Aaron,

Ida Reid and Evelyn Baxter on their "discrimination" claims under Article 10 of the Agreement but denied summary judgment on plaintiffs' other claims disposed of now.

**4.** Seventy-nine types of jobs are classified in Group A, ten in Group B, and eight in Group C. Agreement, Appendix H.

nent positions. Under Section 24(a), employees with permanent jobs in closed departments may displace employees who have less plant seniority in permanent jobs in other departments. Section 24(a) does not explicitly refer to Article 10 of the Agreement.

An employee who does not or cannot "displace" under Section 24(a) may also "bump" into non-posted (temporary) jobs in other departments on the basis of plant seniority under Article 9, Section 24(c). Section 24(c) refers to the procedures provided by Article 9, Section 17, also applicable where a department is not closed but undergoes a permanent reduction in work force. Employees who go on layoff status can bump back into the plant only after they have been on layoff for eight or more consecutive weeks. Agreement, Article 9, Section 17(f). Article 21 provides separation allowances and also requires Oscar Mayer to "give notice at (sic) the closing of the plant or division of the plant or a major department of the plant at least six (6) months prior to such closing."

On July 17, 1981, Oscar Mayer posted and mailed notices that it would close plant Department 146. On August 21, 1981, Oscar Mayer posted and mailed notices that it would also close Departments 161 and 164. The five female plaintiffs were working Group B jobs in Department 164 on February 26, 1982, the day the department was permanently closed.

### Plaintiffs Cronin, Aaron, Reid, Baxter and Cofey

In late 1981 after Oscar Mayer announced that three departments would close, Armin J. Steckler, Personnel Manager, reviewed the provisions of the Agreement applicable to department closings. On December 18, 1981, Mr. Steckler met with Frank Quattrone, then President of Local 125,[5] to discuss the matter. Mr.

Steckler and Mr. Quattrone met in early January, 1982, with the Vice-President/Plant Manager, the Production Manager, Engineering Manager, and the Executive Board of Local 125. The union officers did not agree completely with Oscar Mayer's interpretation of the Agreement in regard to department closings but they agreed Article 10 applied to the provisions of Article 9, Section 24, i.e., employees in closed departments would not be considered for displacement to jobs primarily of interest to members of the opposite sex *unless they so requested.*

On January 31, 1982, the Local 125 stewards, including plaintiff Cofey,[6] attended a meeting called by Mr. Quattrone. Mr. Quattrone handed out copies of an Oscar Mayer memorandum, dated December 18, 1981,[7] regarding Article 21 of the Agreement. Mr. Quattrone stated at the meeting that this document had not been signed nor approved by the union in any way. A general union meeting was held one hour after the stewards' meeting. Among other matters, the Oscar Mayer memorandum interpreting Article 21 was discussed. The necessity for female employees to specifically request consideration for displacement to Group A jobs was not discussed at either of the meetings on January 31, 1982.

During the first two weeks of February, 1982, Mr. Steckler met with all employees directly affected by the imminent department closings in groups. He discussed their rights and options under Section 14, 17, and 24 of Article 9 and Article 21 of the Agreement; he relied in part on the Oscar Mayer Article 21 memorandum discussed at the union meetings on January 31, 1982. Each employee who attended these February meetings was given certain documents explaining rights and options. Mr. Steckler also answered questions but he was not asked, and did not volunteer, that female

---

**5.** Plaintiff Mielcarek was elected President of Local 125 in 1983. Plaintiff Cofey and another employee ran against Mr. Quattrone unsuccessfully in 1977, 1979, and 1981.

**6.** Plaintiff Cofey was day shift steward in Department 164.

**7.** This document was not a trial exhibit; however, it was Exhibit 1 to the Affidavit of Armin J. Steckler in Support of Motion of Oscar Mayer to Dismiss, filed October 4, 1982.

employees must expressly request Group A jobs to be considered for them. Mr. Quattrone also attended those meetings; at certain of them he was asked whether female employees had to request consideration for Group A jobs and he answered that they did. Employees were told that if Mr. Steckler or some other management representative did not speak to them personally before February 22, 1982, it was likely they would be among those laid off.

After these group meetings but before February 25, 1982, the five female plaintiffs (and certain other employees) jointly retained counsel. Counsel prepared a form letter stating in part: "I am willing and able to take another job in the Philadelphia plant immediately following February 26, 1982...." The letter did not explicitly state that the signatory wished to be considered for a Group A job (Ex. P-7, P-8, DM-9, DM-10).

On the morning of February 25, 1982, plant supervisors asked Department 141, 161 and 164 employees who had not yet displaced other workers to sign "work preference forms." These forms, which are described by the Agreement, are used to state the categories of jobs for which an employee wishes consideration in "bumping" or recall from layoff status. The five female plaintiffs and certain other employees refused to sign these forms.

On the afternoon of February 25, 1982, plaintiff Ida Reid handed Mr. Steckler an executed copy of the form letter prepared by counsel (Ex. DM-10). They did not discuss the letter's contents nor did Ms. Reid explicitly state that she desired consideration for displacement to a Group A job. But the next morning, Mr. Steckler concluded, after a conversation with Sara Hart, Employment Secretary, that Ms. Reid did wish to displace into a Group A job. Later that morning, at Mr. Steckler's request, production manager Russell Wiverstad showed Ida Reid three Group A jobs in other departments. Other employees with greater seniority were also choosing among these and other jobs, but plaintiff Reid

obtained the job she preferred in Department 125 and reported for work at 3:30 p.m. on February 26, 1982. Three weeks later Ms. Reid was laid off from that job but she has filed no grievance challenging her layoff or the selection of jobs offered her on February 26, 1982.

After plaintiff Reid was shown Group A jobs in other departments supervisors again presented "work preference forms" for execution. Plaintiff Reid protested that she should not have to sign the form but did so. Plaintiffs Cronin, Aaron, Baxter and Cofey signed the forms (Ex. DM-22, DM-24, DM-36, DM-21). None of the five female plaintiffs selected job categories on the forms and none told her supervisor she wished to displace to a Group A job. When she signed the form, plaintiff Cofey knew that plaintiff Reid had already been shown Group A jobs. Plaintiff Cofey did not ask her supervisor why this was so; neither did she ask why she was not offered a Group A job.

Plaintiff Cofey testified that on February 25, 1982, she had handed Mr. Steckler copies of letters prepared by counsel and executed by her (Ex. P-7, P-8), plaintiffs Cronin, Baxter and Aaron and one other employee (Ex. DM-9) (Tr. 4.49–4.53 *et seq.*). Plaintiff Cofey testified that she did not mention these letters to her supervisor (Tr. 4.92), but on March 1, 1982 she told Denise Bennett, Personnel Office Secretary, that she had handed in the letters on February 25, 1982 (Tr. 4.97). Mr. Steckler did not remember receiving any letters from plaintiff Cofey (Tr. 5.134–5.135 *et seq.*) but he saw the letters of plaintiffs Cronin, Aaron and Baxter, former plaintiff Stafford, and one other employee (Ex. DM-9) in early March, 1982 after they were submitted to the Employment Secretary by plaintiff Reid. These letters were stamped received by the Personnel Department on March 5, 1982.[8]

Each form letter was dated "February ——, 1982." The letters of plaintiff Reid and one other employee were dated Febru-

---

**8.** The female plaintiffs filed their first grievance    on March 5, 1982. *See infra.*

ary 25, 1982, but those of plaintiffs Cronin and Aaron and former plaintiff Stafford were dated February 26, 1982. The date on plaintiff Baxter's letter was blank but she testified that she did not give her executed letter to plaintiff Cofey until February 26, 1982 (Tr. 5.48). Plaintiff Aaron did not remember executing or turning in her letter before February 26, 1982 (Tr. 5.79). Plaintiff Cofey's letter was not introduced as an exhibit at trial.

No other plaintiff had direct knowledge of when plaintiff Cofey delivered the letters. Ms. Reid did not refute Mr. Steckler's testimony that she had submitted the letters Oscar Mayer's Personnel Department acknowledged were received in early March, 1982 (Ex. DM–9). Defendants did not call the Employment Secretary or the Personnel Office Secretary but there was no evidence that either was still in the employment of Oscar Mayer at time of trial. The court concludes the form letters executed by the female plaintiffs were not received by Oscar Mayer until *after* February 26, 1982 except for that of plaintiff Reid.

None of the plaintiffs discussed their displacement or the propriety of their layoff with any union officer other than plaintiff Cofey (who was a shop steward) until *after* February 26, 1982. When Department 164 was closed on February 26, 1982, plaintiff Reid reported to Department 125 that afternoon; plaintiffs Cronin, Aaron, Baxter and Cofey went on layoff status, effective March 1, 1982. All five female plaintiffs had sufficient plant seniority to displace into Group A jobs on the second but not the first shift.[9] None had enough seniority to displace into any Group B or C job. Their plant seniority dates are: Josephine Cronin, September 5, 1967; Irma Aaron, October 11, 1967; Ida Reid, August 21, 1967; Evelyn Baxter, February 27, 1968; and Katie Cofey, March 25, 1968.

On March 1, 1982, plaintiff Cofey went to the Personnel Office at the plant and spoke with Ms. Bennett. Plaintiff Cofey examined the work preference form she had signed on February 26, 1982, and asked what she needed to do to return to work in any job including those in Group A. Ms. Bennett told plaintiff Cofey that because she was on layoff status she would have to wait to displace into the plant. Plaintiff Cofey did not discuss plaintiff Reid's displacement into a Group A job.

On March 5, 1982, the five female plaintiffs and two other employees filed Grievance No. 51 (Ex. DM–12). The "Statement of Grievance" relates:

> Violation of Section 24(a)(4) Discontinuance of a Department. This violation has forced us into an untenable position. Since we were not allowed to pick up department seniority plus one day, people junior to us are subject to recall from layoff before us. The seriousness of this violation warrants that we be compensated in any and every instance where junior people are allowed to work instead of us.

At no time during the processing of Grievance No. 51 did the five female plaintiffs inform any union officers of their letters submitted to the Personnel Office. Grievance No. 51 proceeded through all steps of the grievance procedure provided by Section 3(a)-(c) of Article 11 of the Agreement and was denied by Oscar Mayer. In the third step, Mr. Steckler responded to the grievance in a memorandum to Mr. Quattrone dated March 17, 1982 (Ex. DM–13). He wrote in part:

> The grievants were not offered the displacement option mentioned in Article 9, Section 24(a)(4) of the Labor Agreement because they did not possess sufficient plant seniority to displace a *posted* employee in a group B–C job on the second shift.... In accordance with Article 10, Section 3(b) of the Labor Agreement and past practice, the grievants, except for Ida Reid, were not considered for displacement of any junior posted employ-

---

**9.** An employee who displaces into the next shift under Article 9, Section 24, picks up the department seniority plus one day of the displaced person. An employee who bumps under Article 9, Section 17 keeps his or her original department seniority.

ees in group A–C jobs because they did not request such displacement.

"A–C" and "B–C" jobs in this memorandum refer to Group A and Group B jobs as defined by the Agreement.

Vice-President/Plant Manager J.C. Miles restated Oscar Mayer's position in a memorandum to Mr. Quattrone dated April 15, 1982 (Ex. DM–14). He wrote that none of the grievants had sufficient seniority to displace into a Group B or Group C job and that "only Ida Reid chose to attempt to qualify for a group A job."

Article 11, Section 3(d) of the Agreement provides that the company or the union may demand arbitration after the grievance procedure concludes. It costs the union approximately $3,000 to arbitrate a grievance. The Executive Board of Local 125, which included two female members, voted unanimously not to demand arbitration of Grievance No. 51. If the union had demanded arbitration it would not have occurred before May 10, 1982.

Plaintiff Cofey filed three additional grievances on her own behalf; Grievance Nos. 52, 53, and 54 (Ex. DM–15, DM–17, DM–19). All three grievances proceeded through all steps of the grievance process prior to arbitration but were denied by Oscar Mayer. The union did not demand arbitration of any of these grievances.

The "Statement of Grievance" in Grievance No. 52 relates: "Section 17(b) Reduction of Work. This is a self-explanatory passage of the contractual agreement. Please see Page 28." ("Page 28" means page 28 of the Agreement.) In a memorandum to Mr. Quattrone dated April 15, 1982 (Ex. DM–16), Mr. Steckler wrote in part: "The grievant did not elect on the preference sheet to be assigned to an A job discussed in Article 9, Section 17(b). Consequently, Section 17(b) is not applicable...."

In Grievance No. 53, the "Statement of Grievance" section relates:

Violation of article 10, Section 1(a) Section 3(b). On 3–1–82, I subscribed to the normal procedures in order to obtain work in an "A" job capacity. I submit

that I was discriminated against as a woman, in that I was not allowed to assume such a position. I further submit that I was selectively discriminated against in that in past practice (and upon request as I did), women have been allowed to work "A" jobs. The most recent case was in the person of "MRS. IDA REID." (Emphasis in original.)

Plaintiff Cofey stated that she requested a Group A job on March 1, 1982; in referring to plaintiff Reid, plaintiff Cofey did not assert that she requested a Group A job on February 25, 1982. This is consistent with the court's conclusion that only plaintiff Reid submitted her job request letter in February. In responding to Grievance No. 53, Mr. Steckler wrote Mr. Quattrone in a memorandum dated April 15, 1982: "In accordance with Article 10, section 3(b) and past practice, the grievant was not considered for displacement of any junior posted employees in Group A–C jobs because she did not request such displacement." (Ex. DM–18). Mr. Steckler acknowledged that plaintiff Reid asked for a Group A job.

In Grievance No. 54, the "Statement of Grievance" section relates: "Article 10, Section 1, Section 2(a), Section 3(b). I maintain that my seniority rights were violated when you failed to apply and comply that (sic) portion of the language of Title Seven of the 1964 Civil Rights Act which deals with Seniority Lists." In Mr. Steckler's memorandum to Mr. Quattrone, dated May 7, 1982 (Ex. DM–20), he responded to Grievance No. 54 in part by writing: "[I]n acordance with past practice and Article 10, Sections 3(a) and 3(b), the grievant was not considered for displacement of any junior posted employees in group A–C jobs because she did not request such displacement. She gave no indication she wanted to be assigned to an A job."

At no time during the processing of Grievances Nos. 52, 53 and 54 did plaintiff Cofey inform any union officers of the letters the female plaintiffs had submitted to the Personnel Office nor assert to either the company or the union that her letter

had been submitted before Department 164 closed.

On or about May 3, 1982, Oscar Mayer recalled plaintiff Cofey but she declined for medical reasons. She was permitted to remain on layoff status for another week and she returned to the plant to a Group A job on May 10, 1982.

On or about March 26, 1982, plaintiff Baxter advised Oscar Mayer that she would accept recall to a Group A, Group B or Group C job. On April 26, 1982, plaintiff Baxter returned to work in a Group A job.

On or about April 22, 1982, plaintiff Aaron advised the company that she would accept recall to a Group A or other job. On April 26, 1982, plaintiff Aaron returned to work in a Group A job.

On or about May 6, 1982, plaintiff Cronin advised Oscar Mayer that she would accept recall to any category of job, including Group A. On May 10, 1982, plaintiff Cronin was recalled to a Group A job.

### Plaintiff Mielcarek

Plaintiff Anthony M. Mielcarek worked in Department 121 of the plant. On February 26, 1982, Department 121 underwent a permanent reduction in force; this was not a permanent closing.[10] Following the reduction in force in Department 121, there were five employees:

1st Shift

Steward Donald K. Poland

John Melnyk

Department 121 Seniority Date: May 28, 1951

Dominic R. Dimatteo

Department 121 Seniority date: July 19, 1951

2nd Shift

Steward Gerald B. Ragin

3rd Shift

Steward David A. Fitzpatrick

Plaintiff Mielcarek's plant seniority date was August 29, 1951; his Department 121

seniority date was September 10, 1951. Plaintiff Mielcarek had greater plant and department seniority than the three stewards who remained in Department 121 after the reduction in force.

Article 3, Section 2 of the Agreement provides:

Section 2—Superseniority for Stewards

The present Plant Steward shall be considered to have the highest seniority in the plant, in the event of a lay-off, and each employee who is presently a steward shall be considered to have the highest seniority in his department on his shift, in the event of a lay-off, providing in each case that the steward involved has the necessary skill, training and ability to perform the work in such job as may be available to employees becoming stewards in the future provided that they have at least two (2) years of employment.

Oscar Mayer, applying this provision of the Agreement, retained the three stewards in Department 121.

In late 1981, Mr. Quattrone sought the advice of the international union counsel regarding the legality of applying the superseniority provision in Article 3, Section 2 to Department 121's reduction in force. He did not then know exactly how many jobs would remain after the reduction. Counsel's opinion was that the superseniority was legally applicable but the exact facts and question(s) presented by Mr. Quattrone and the precise response of counsel are not of record. In October, 1981, Local 125's Executive Board voted unanimously that Article 3, Section 2 would apply to Department 121 and elsewhere in the plant.

In early February, 1982, plaintiff Mielcarek attended one of the "options" meetings held by Mr. Steckler and attended by Mr. Quattrone. Some days later Mr. Mielcarek met with Mr. Steckler, Shipping Supervisor Robert L. Magee, and three other employees; he was then informed that his posted

---

**10.** This distinction was upheld by arbitrator Myron L. Joseph, AAA Case No. 14–30–0677–82–A, November 4, 1982 (Ex. DM–2).

job in Department 121 would be eliminated and he could choose displacing into another department, bumping, going on voluntary layoff or retiring. He was given a list of 16 or 17 posted jobs in another department which he could choose. Plaintiff Mielcarek protested that he should be allowed to remain in Department 121 and should also have more job choices. He did not chose another job then. On February 25, 1982, Mr. Steckler and Mr. Magee told plaintiff Mielcarek that if he did not choose a job into which to displace or bump, he would go on layoff status. He chose to displace into the most junior posted position on the list, a forklift operator position in Department 230.[11]

Sometime on or before February 26, 1982, plaintiff Mielcarek filed Grievance No. 49 (Ex. DM–5) to challenge his removal from Department 121. The "Statement of Grievance" section relates:

On February 26, 1982 my posted job will be eliminated. At such time, I must displace a junior employee in the plant. I cannot remain in my department on any shift because a Department Steward claims the posted job on his shift. I have been denied my right to Department seniority. My contention is that layoff and job elimination are not the same.

Mr. Mielcarek, presenting his grievance to Steward John Helt, requested the union to take the grievance "all the way," that is, to process it through arbitration, if necessary.

Mr. Steckler responded to Grievance No. 49 in a memorandum to Mr. Quattrone dated March 10, 1982 (Ex. DM–3). The memorandum states:

Anthony Mielcarek lost his posted job in Department 121 on February 26, 1982. He was denied rights to a posting in Department 121 because the first, second and third shift stewards, although junior to Tony, have the right to a job on their respective shifts. This is because of the provisions of Article 3, Section 2 of the Labor Agreement. It is our understanding (confirmed by competent legal counsel) that the concept of superseniority for stewards is just and valid under the current labor laws of the United States.

Mr. Miles responded to Grievance No. 49 in a memorandum to Mr. Quattrone dated April 8, 1982 (Ex. DM–23). His memorandum provides:

Please refer to Armin Steckler's answer to this grievance dated 3/10/82. I agree with Mr. Steckler's confirmation of the validity of Article 3, Section 2 of the Labor Agreement.

Mielcarek's undated grievance states 'My contention is that layoff and job elimination are not the same'. (sic) This statement is technically correct but it must be carried through to the contractual options and conclusions described in Article 9, Section 14. If Tony had chosen to follow the provisions described in the last sentence of Article 9, Section 14, he could indeed have retained his department seniority and could have acquired work as provided under Article 9, Section 17. Tony, instead, exercised his right to displace and therefore *voluntarily* and *permanently* gave up his 121 department seniority.

I conclude this matter by repeating the essence of the first paragraph above. Mielcarek at no time had the right to retain work or seniority in Department 121 by bumping or displacing a department 121 shop steward.

The responses of Mr. Steckler and Mr. Miles took plaintiff Mielcarek's grievance regarding superseniority through the third step of the grievance procedure provided by the Agreement. Mr. Quattrone informally decided not to demand arbitration of Grievance No. 49 because of the prior vote of the union's Executive Board that the

---

**11.** Because plaintiff Mielcarek displaced under Article 9, Section 14 of the Agreement instead of bumping under Article 9, Section 17, he gave up his Department 121 seniority. An employee who simply bumps retains his or her original department seniority, but an employee who displaces under Article 9, Section 14 gives up seniority in the former department for equivalent seniority in the new department.

Agreement's superseniority provision applied to the situation in Department 121.

Under Article 9, Section 8(d) of the Agreement, an employee is entitled to a "reasonable period of up to twenty (20) accumulated days worked" in which to qualify for a job into which he or she has displaced. On March 1, 1982, Mr. Mielcarek began work as a forklift operator position in the shipping department (Department 230). Supervisor Daniel Harkins showed plaintiff Mielcarek around the shipping department and described what his duties would be.

Plaintiff Mielcarek had driven automobiles, motorcycles and flown airplanes but he had never operated any riding machinery at the plant. He was assigned to operate a speedjack, an electrically-operated vehicle for lifting pallets, that is driven by an operator standing on the machine. The speedjack is different from a forklift but plaintiff Mielcarek was assigned to the speedjack to train him in riding a large piece of machinery. He spent his first two weeks in Department 230 using the speedjack. On the last working day of the second week Supervisor Harkins told plaintiff Mielcarek that he was doing well and would be assigned to a forklift in the next week.

Plaintiff Mielcarek testified that he was not actually assigned to the forklift until the second day of his fourth week in Department 230 (Tr. 1.41 *et seq.*), but that he used the forklift on certain occasions during the third week (Tr. 1.44). Mr. Mielcarek was unsure exactly when he used the forklift (Tr. 1.75–1.76). Supervisor Joseph Parkhill testified that plaintiff Mielcarek was assigned to forklift operation during the third through fifth weeks of his employment in Department 230 (Tr. 1.128 *et seq.*). Supervisor Magee also testified that Mr. Mielcarek spent those weeks using the forklift (Tr. 2.6 *et seq.*). The court concludes that plaintiff Mielcarek spent substantial time on the forklift during his third, fourth and fifth weeks in Department 230.

At no time during these five weeks did Mr. Mielcarek complain to either the company or the union that he was given inadequate time within which to qualify as a forklift operator nor did he complain that he was given inadequate instruction. However, plaintiff Mielcarek had difficulty in using the forklift. (Tr. 1.126–1.128, 1.130, 2.4, 2.7, 2.24, 2.25, 2.32–2.33, 2.36–2.37, 2.60–2.61).

During plaintiff Mielcarek's fourth week in Department 230, Supervisor Parkhill told Mr. Quattrone that Mr. Mielcarek was having serious problems and his disqualification was likely. Mr. Quattrone requested that plaintiff Mielcarek have another week to qualify. Supervisor Parkhill communicated this request to Supervisor Magee. On the last working day of the fourth week, March 26, 1982, Supervisor Magee and Steward John Helt met with plaintiff Mielcarek to discuss his inadequate performance as a forklift operator. Mr. Magee's memorandum of this meeting referred to speed and coordination problems (Ex. DM–4). However, plaintiff Mielcarek was given an additional week to qualify as a forklift operator in part because of Mr. Quattrone's request.

Mr. Quattrone observed plaintiff Mielcarek during his fifth week in Department 230. At the end of that week, on April 2, 1982, plaintiff Mielcarek was called to a meeting with Steward Helt and Supervisors Parkhill, Carl Leneis and Nick D'Amelio. He was informed that he was disqualified on the forklift because of his inability to operate the machine.[12] On April 5, 1982, plaintiff Mielcarek filed a grievance over his disqualification (Ex. P–4). The "Statement of Grievance" section relates:

On April 2, 1982 I was disqualified for job 074 that I assumed in Dept. 230 on March 1, 1982. At the time I selected job 074, I asked for a specific description of the job duties that had been performed by the person (Frank Joyce) I had dis-

---

**12.** Following his disqualification, plaintiff Mielcarek was assigned to other available jobs in Department 230. This was governed by Article 9, Section 24(4)(e) of the Agreement.

placed. I was not given that description. During the 25 days I worked job 074, I did what I was told to do which involved duties other than operating a forklift. I damaged no product, no one else had to help me complete my duties; I did not make over time to catch up my (sic) normal work. My grievance is to demand a written explanation of why I was disqualified. (See attached letter to executive board regarding options interview.)

Supervisor Carl Leneis responded to the grievance in a memorandum dated April 9, 1982 detailing plaintiff Mielcarek's problems as a forklift operator (Ex. P–5).

Mr. Quatronne discussed plaintiff Mielcarek's problems with Steward Helt, an experienced forklift operator. Mr. Helt confirmed plaintiff Mielcarek's shortcomings as an operator. Mr. Quattrone also discussed Mr. Leneis' memorandum with plaintiff Mielcarek; he did not request further processing of his grievance. Mr. Quattrone did not pursue the grievance further because plaintiff Mielcarek did not request it and the memorandum from Mr. Leneis provided the written explanation demanded by plaintiff Mielcarek in his grievance. Mr. Quattrone did not believe the grievance had merit.

In early 1983, plaintiff Mielcarek qualified to operate a slipsheet forklift at the plant. The slipsheet forklift differs from an ordinary forklift; it has two large sheets of metal instead of two prongs in front. At trial plaintiff Mielcarek waived his pension claim (Tr. 1.122) and his damage claims (Tr. 1.94). He now seeks restoration to Department 121 or, in the alternative, to the forklift position from which he was disqualified (Tr. 1.130–1.133).

### Discussion

Plaintiffs sue their employer and their union under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. To prevail against either an employer or a union in a suit under 29 U.S.C. § 185 an employee-plaintiff must show both a breach of the collective bargaining agreement by the employer and a breach of the "duty of fair representation" by the union. *DelCostello v. Int'l. Brotherhood of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476, 489 (1983); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231, 245 (1976).

Plaintiffs Cronin, Baxter, Aaron, Reid and Cofey allege that Oscar Mayer violated their seniority rights under the Agreement when it closed their department and did not displace them into other jobs in the plant. Plaintiff Cofey also asserts a discrimination claim under Article 10 of the Agreement. Plaintiff Mielcarek claims that Oscar Mayer incorrectly applied the Agreement's superseniority provisions so that he lost his job in Department 121 and that he was wrongfully disqualified from a subsequent position. All plaintiffs sue Local 125 on the theory that it has breached the "duty of fair representation" owed to plaintiffs with regard to their claims against Oscar Mayer.

A union serving as the exclusive bargaining representative of all the employees in a bargaining unit pursuant to 29 U.S.C. § 159(a) has the duty of representing each and every employee in that unit fairly. *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 371 n. 22, 104 S.Ct. 1844, 1851 n. 22, 80 L.Ed.2d 366, 376 n. 22 (1984); *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Sisco v. Consolidated Rail Corp.*, 732 F.2d 1188, 1191–92 (3d Cir.1984). The union's duty of fair representation extends not only to the collective bargaining process but also to grievance and arbitration procedures provided by the collective bargaining agreement. *Hines*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Starks v. Perloff Bros., Inc.*, 760 F.2d 52 (3d Cir.1985).

### Plaintiffs Cronin, Aaron, Reid, Baxter and Cofey

The five female plaintiffs contend that Oscar Mayer violated their seniority rights under the Agreement by:

i) requiring that they expressly request consideration for displacement into Group A jobs; and

ii) ignoring their requests to be considered for displacement into any jobs in the plant, including Group A jobs.

Either of these contentions if proven would be a breach of the Agreement sufficient to satisfy that element of a plaintiff's case in a hybrid breach of contract/duty of fair representation suit under 29 U.S.C. § 185, but the plaintiffs have failed to prove either.

■ When Department 164 closed, plaintiff Reid *was* displaced into a Group A job in another department on February 26, 1982. She was laid off from that job three weeks later, but plaintiff Reid filed no grievance complaining of the selection of Group A jobs she was offered or her subsequent layoff. Plaintiff Reid failed to make such complaint before this court and has shown no breach of the Agreement of which she can complain; she cannot prevail against the defendants.

■ Oscar Mayer did not breach the Agreement by requiring express request for consideration for a Group A job. The displacement procedure provided by Article 9 is an application of seniority under the contract. Article 10, Section 3 of the Agreement provides that, "in applying seniority" employees will not be required to take nor considered for jobs primarily of interest to members of the opposite sex *unless they so request.* Oscar Mayer's application of this request requirement to Article 9, Section 24(a) was correct even though it does not specifically refer to Article 10, Section 3. The requirement of Article 10, Section 3 was a general provision governing the application of seniority and did not have to be reiterated in each related contractual provision.[13]

The propriety of a collective bargaining agreement that categorizes jobs as primarily male (Group A) and primarily female (Group B) is not before the court. The plaintiffs have not challenged the classification of 79 of 97 job categories in the plant as Group A jobs; this classification system was approved by the EEOC in the 1975 Conciliation Agreement. This suit is not under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and there is no evidence that plaintiffs have received a final adverse decision by the EEOC with regard to the matters in dispute in this action. Plaintiffs specifically stated at trial that they made no claim under Title VII (Tr. 1.3). Therefore, the court is bound to apply this Agreement and finds no breach by Oscar Mayer of the female plaintiffs' rights thereunder. Plaintiff Cofey's claim under Article 10 of the Agreement, its non-discrimination provision, also fails for lack of evidence of sex discrimination against her in the absence of an attack on Article 10 of the Agreement as discriminatory in and of itself.

Oscar Mayer did not ignore requests for Group A jobs by the four other female plaintiffs. The form letters submitted by these plaintiffs did not explicitly request Group A jobs and even these letters were not submitted to Oscar Mayer until *after* February 26, 1982. After Department 164 had closed, plaintiffs could not bump back into the plant under the Agreement until they had been on layoff status for at least eight consecutive weeks.

Plaintiffs were notified that Department 164 would be closed six months in advance. There is no evidence that if plaintiffs had requested consideration for Group A jobs prior to closing they would not have received them. The plaintiffs had numerous opportunities to request Group A jobs but did not do so until *after* Department 164 was closed. Oscar Mayer did not breach the Agreement by ignoring timely requests for Group A jobs by these plaintiffs; there were none. Plaintiffs cannot prevail against the defendants.

---

**13.** This is so even though Article 9, Section 24(e) explicitly referred to Group A and B jobs. Section 24(e) does not expressly refer to Article 10, Section 3 but that provision clearly applies to both subsections of Section 24.

■ Plaintiffs have failed to prove breach of the duty of fair representation by Local 125. The duty of fair representation requires a representative union "to serve the interests of all members [of a bargaining unit] without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *DelCostello*, 462 U.S. at 167 n. 14, 103 S.Ct. at 2290 n. 14, 76 L.Ed.2d at 489 n. 14; *Vaca*, 386 U.S. at 177, 87 S.Ct. at 910, 17 L.Ed.2d at 850. "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916, 17 L.E.2d at 857. *Accord, Starks*, 760 F.2d at 54; *Findlay v. Jones Motor Freight*, 639 F.2d 953, 957 (3d Cir. 1981). Ordinary negligence by a union in handling an employee's grievance does *not* constitute a breach of the duty of fair representation. *Riley v. Letter Carriers Local No. 380*, 668 F.2d 224, 228 (3d Cir. 1981); *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir.1970); *Larry v. Penn Truck Aids, Inc.*, 567 F.Supp. 1410, 1414 (E.D.Pa.1983).

Local 125 did not breach any duty toward the female plaintiffs prior to the closing of Department 164. At the meetings to discuss employee options in the first two weeks of February, 1982, Mr. Quattrone told those female employees who asked that they needed to request a Group A job in order to be considered for one. Although the closing of Department 164 was announced six months in advance, none of these plaintiffs discussed their displacement options or the propriety of their layoffs with any union officer until *after* February 26, 1982. Plaintiff Cofey was a union steward. Each of these women was given a copy of the Agreement and could have obtained further information; they simply failed to do so. Local 125 breached no duty in its conduct towards them prior to their layoff.

■ Nor did Local 125 breach its duty of fair representation in processing the female plaintiffs' grievances. Grievance Nos. 51–54 all proceeded through all steps of the grievance process prior to arbitration. To arbitrate a grievance costs the union approximately $3,000. The Executive Board of the union considered the merits of Grievance No. 51 and voted unanimously not to demand arbitration; Grievance Nos. 52–54 simply reargued the same complaint in different words. The union had good reason to conclude that Grievance Nos. 51–54 had little merit; each grievance in effect attempted to compensate for a failure to make a timely request for a Group A job. At no time during the processing of any of these grievances did plaintiffs assert either to the union or Oscar Mayer that they had requested Group A jobs on or before February 26, 1982. There is no credible evidence of improper union motivation. Local 125 did not breach the duty of fair representation to the female plaintiffs by failing to demand arbitration or in any other way. Defendants are therefore entitled to judgment in their favor because the female plaintiffs have failed to show either a breach of the Agreement or of the duty of fair representation.

### Plaintiff Mielcarek

■ Plaintiff Mielcarek argues that the Agreement's superseniority provision applies only to a layoff, not to the permanent reduction of work force that occurred in Department 121. The superseniority provision states that it applies "in the event of a layoff." Agreement, Article 3, Section 2. Defendants argue that the superseniority provision applied to the Department 121 permanent reduction in force because the stewards would have gone on layoff status if they had not been retained. While true,[14] this is legally irrelevant. There was a *permanent* reduction in work force of Department 121, not temporary layoffs, largely or completely because of the *permanent* closing of Departments 146, 161 and 164; the number of jobs in Department

14. *See* Agreement, Article 9, Section 15.

121 underwent a *permanant* not a temporary decrease and employees not retained as a result were not subject to recall to the positions that were eliminated thereby. There is nothing in the Agreement to suggest that the contract uses the term "layoff" to mean anything other than a *temporary* suspension of employment.

The National Labor Relations Board ("NLRB") has consistently ruled that contractual provisions for superseniority in circumstances other than layoff and recall are presumptively unlawful. *Niagara Machine & Tool Works*, 267 N.L.R.B. 661 (1983), *enforced sub nom, N.L.R.B. v. Niagara Machine & Tool Works*, 746 F.2d 143 (2d Cir.1984); *Gulton Electro-Voice, Inc.*, 266 N.L.R.B. 406 (1983), *enforced sub nom, Local 900, I.U.E v. N.L.R.B.*, 727 F.2d 1184 (D.C.Cir.1984); *Perfection Automotive Products Corp.*, 232 N.L.R.B. 690 (1977); *United Electrical, Radio and Machine Workers of America, Local 623*, 230 N.L.R.B. 406 (1977) (Limpco Manufacturing, Inc.), *petition for review denied sub nom, D'Amico v. N.L.R.B.*, 582 F.2d 820 (3d Cir.1978); *Dairylea Cooperative, Inc.*, 219 N.L.R.B. 656 (1975), *enforced sub nom, N.L.R.B. v. Milk Drivers Local 338*, 531 F.2d 1162 (2d Cir.1976). *See also Local 1384, U.A.W. v. N.L.R.B.*, 756 F.2d 482, 488–90 (7th Cir.1985).

This contract's superseniority provision is clearly and expressly limited to layoffs and inapplicable to the permanent reduction of force in Department 121. On February 26, 1982, plaintiff Mielcarek was entitled by virtue of his departmental seniority to stay in Department 121. Therefore, Oscar Mayer breached the Agreement in allowing superseniority to three stewards with less seniority than plaintiff Mielcarek and retaining them in preference to plaintiff Mielcarek upon the permanent reduction in work force of Department 121.

■ But whether Oscar Mayer breached the Agreement is not dispositive. Plaintiff Mielcarek must also prove Local 125's conduct regarding the superseniority issue was in bad faith, or arbitrary or discriminatory in violation of its duty of fair representation. Plaintiff Mielcarek has not pleaded nor proved animus toward him on the part of any union official; there was no bad faith. The only questions are whether the union conduct was arbitrary or discriminatory.

Local 125 formulated its policy regarding superseniority in Department 121 in October, 1981, when it was not known how many employees would remain in that department after the permanent reduction in work force. Local 125's policy was formulated after consultation with the international union's counsel; exactly what counsel advised and the factual assumptions on which counsel's opinion was based is not known. Mr. Quattrone stated that the local union's determination was based on the NLRB's ruling in *Dairylea* and *Union Carbide Corporation*, 228 N.L.R.B. 1152 (1977).

The union's reliance on *Dairylea* and *Union Carbide* was misplaced. In *Dairylea*, the NLRB ruled that a contractual provision granting preference to union stewards for layoff, recall, overtime assignment, vacation selection and assignment of route, shifts and hours constituted an unfair labor practice in violation of 29 U.S.C. §§ 158(a)(1), 158(a)(3), 158(b)(1)(A), and 158(b)(2) because it discriminated in favor of union membership. The NLRB ruled that superseniority benefits applied beyond layoff and recall situations were presumptively unlawful. *Dairylea*, 219 N.L.R.B. at 658. In *Union Carbide*, the NLRB found that presumption of illegality rebutted where a clause granting union stewards the right to refuse department or shift transfers justified; stewards in *Union Carbide* had jurisdiction over a single department and forfeited their stewardships when transferred. *Union Carbide*, 228 N.L.R.B. at 1153.

Local 125 did little to reevaluate the superseniority question when plaintiff Mielcarek filed Grievance No. 49. The grievance did receive the functional equivalent of consideration at the third step of the grievance procedure but was not arbitrated. Local 125's Executive Board did not vote on

whether to demand arbitration; the Board and Mr. Quattrone informally decided not to demand arbitration on the basis of their earlier assessment of the superseniority clause. Local 125's processing of plaintiff Mielcarek's superseniority grievance was hardly a model of vigorous union activity. However, the responsible union officer did attempt to assess both the meaning and legality of the Agreement's superseniority provision. The union's processing of Grievance No. 49 was not so perfunctory or arbitrary that it violated the duty of fair representation. *Riley v. Letter Carriers Local No. 380,* 668 F.2d 224, 228–29 (3d Cir.1981); *Medlin v. Boeing Vertol Co.,* 620 F.2d 957 (3d Cir.1980). Mere negligence in the processing of a grievance does not constitute a breach of the duty.

■ In the absence of bad faith or arbitrary conduct the sole remaining issue is whether the union acted in a discriminatory manner. In cases or proceedings dealing with unfair labor practice charges under 29 U.S.C. §§ 158(a)(3) and 158(b)(2), superseniority provisions are often labeled "discriminatory." *See, e.g., Local 1384, U.A.W. v. N.L.R.B.,* 756 F.2d 482 (7th Cir.1985); *Niagara Machine & Tool Works, supra; Gulton Electro-Voice, supra; Dairylea, supra.* However, the use of the term "discriminatory" in context refers to the *tendency* of such contractual provisions to promote union membership, and does not mean that they necessarily and conclusively establish improper motivation. In an unfair labor practice proceeding under 29 U.S.C. §§ 158(a)(3) and 158(b)(2), improper motivation must be proved, although the burden of proof is sometimes shifted. *N.L. R.B. v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *Radio Officer's Union v. N.L.R.B.,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954); *Local 1384, U.A.W.,* 756 F.2d at 487–88. In this hybrid breach of contract/duty of fair representation suit, discrimination must be proved not presumed from the existence or application of the Agreement's superseniority provision.

■ Plaintiff Mielcarek has failed to prove improper motivation. The contract's superseniority provision was facially valid but improperly applied by Oscar Mayer and Local 125 to a permanent reduction of force. Local 125 was not attempting to discriminate in favor of union members or others; because the union interpreted the Agreement erroneously, it acted in a manner which incidentally might have encouraged union activity. This does not establish a breach of the duty of fair representation. Therefore plaintiff Mielcarek cannot prevail on his claim of an improper grant of superseniority.

■ Plaintiff Mielcarek's forklift grievance is also without merit. He was given sufficient time in which to qualify as a forklift operator; Oscar Mayer reasonably concluded that plaintiff Mielcarek was not able to operate a forklift properly. He later qualified to operate a somewhat different type of forklift but that does not alter the reasonability of Oscar Mayer's conduct. Oscar Mayer did not breach the Agreement.

Local 125 did not breach the duty of fair representation with regard to the forklift grievance. Mr. Quattrone was largely responsible for Oscar Mayer's giving plaintiff Mielcarek an additional week within which to qualify as a forklift operator. The union processed plaintiff Mielcarek's grievance and he got what he demanded: a written explanation of why he was disqualified. Because there was no breach of the labor contract or the union's duty of fair representation, plaintiff Mielcarek cannot prevail on the claim with regard to his failure to qualify as a forklift operator.

All facts referred to in this discussion shall be deemed incorporated in the court's specific Findings of Fact preceding this Discussion.

### Conclusions of Law

Plaintiff Reid received the job to which she was entitled when Department 164 closed; she filed no valid grievance as to any other matter.

As to plaintiff Reid, there was no breach of the Agreement by Oscar Mayer and no breach of the duty of fair representation by the union.

Plaintiffs Cronin, Aaron, Baxter and Cofey were required to request Group A jobs expressly to be considered for them; they did not do so.

As to plaintiffs Cronin, Aaron, Baxter and Cofey, there was no breach of the Agreement by Oscar Mayer and no breach of the duty of fair representation by the union.

As to plaintiff Mielcarek's seniority claim, Oscar Mayer applied Article 3, Section 2, expressly applicable only in the event of a layoff, to a reduction in force; this was a breach of the Agreement. The union erroneously agreed with this misinterpretation and erred in not pursuing the matter through arbitration. However, the union while acting mistakenly or even negligently did not act arbitrarily, discriminatorily, or in bad faith.

With regard to plaintiff Mielcarek's seniority, the union did not breach its duty of fair representation and Oscar Mayer was entitled to rely on the outcome of the grievance procedure provided for in the Agreement.

As to plaintiff Mielcarek's forklift grievance, Oscar Mayer was justified in finding him not qualified to perform the duties of the job he chose on February 25, 1982. There was no breach of the Agreement by Oscar Mayer and no breach of the duty of fair representation in processing this grievance by the union.

Both defendants are entitled to judgment in their favor on all counts.